2016 IL App (1st) 143694

Fourth Division
May 26, 2016

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| NATIONAL WASTE AND RECYCLING ASSOCIATION, an Illinois Not-For-Profit Corporation, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | No. 14 CH 6107 |
| v. | ) ) | Honorable LeRoy Martin, |
| THE COUNTY OF COOK, | ) ) | Judge Presiding. |
| Defendant-Appellee. | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from a complaint filed by plaintiff National Waste & Recycling Association,[1] an Illinois not-for-profit corporation, which challenged certain provisions of the Cook County Solid Waste and Recycling Ordinance (SWRO), recently enacted by defendant Cook County (County). Cook County Code of Ordinances § 30-776 (approved Jan. 15, 2014). The trial court granted summary judgment in favor of defendant, finding that the County had the authority to enact the SWRO, and as such, it was enforceable. On appeal, plaintiff contends that

---

[1]National Waste & Recycling Association is a trade organization which represents for-profit waste and recycling companies with its principal place of business in Washington, D.C.

the trial court erred in finding that the SWRO was enforceable because the County has neither home rule nor statutory authority to enact the challenged provisions of the SWRO, which renders it void as a matter of law. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3       Pursuant to the Solid Waste Planning and Recycling Act (Solid Waste Act) (415 ILCS 15/1 *et seq.* (West 2012)), the County's Board of Commissioners (Board) adopted its Solid Waste Management Plan Implementation Ordinance on April 18, 2000, which established the "Solid Waste Article" (Article) of the Cook County Code of Ordinances.[2] On January 15, 2014, the Board approved and adopted the SWRO, which renamed the Article the "Solid Waste and Recycling Article" and imposed fees, regulations, and reporting requirements on operators of Cook County-based solid waste and recycling facilities. The Board's stated purpose in enacting the SWRO is to "secure for present and future citizens of the community an environment which is clean, healthful and wholesome." Cook County Code of Ordinances § 30-2 (1980). The following provisions of the SWRO are relevant to the instant appeal.

¶ 4       Division 1 vests rulemaking authority in the Cook County Department of Environmental Control (CCDEC) and provides a hearing process and penalties for ordinance violations. It also provides numerous technical definitions that are specifically applicable to the SWRO, including the definitions of the solid waste and recycling facilities it intends to govern. The SWRO defines solid waste facilities as "sanitary landfills, municipal solid waste transfer stations, and clean construction or demolition debris fill operations located within Cook County, except within the corporate limits of the City of Chicago." It defines recycling facility as "any building, portion of a building or area in which recyclable material is collected, stored, or processed for the purpose

---

[2] The County purposely excluded the City of Chicago from its ordinance, which is required to adopt its own plan.

of marketing the material for use as raw material in the manufacturing process of new, reused or reconstituted products."

¶ 5    Division 2 "implements a solid waste management plan for the management of municipal waste within the County, *** in order to satisfy the requirements of [the Solid Waste Act]." It provides that "[m]unicipal governments have the primary role and responsibility in providing or arranging for waste management services within their jurisdictional areas, whereas the County will implement the coordination, planning, and monitoring of the solid waste management plan throughout [the County] and establish delegation agreements with sub-county waste management agencies and the Illinois Environmental Protection Agency." The Division also provides that for purposes of tracking the implementation of the Solid Waste Management Plan, "any waste hauler operating within the boundaries of Cook County *** shall submit quarterly reports to the Solid Waste Coordinator of the [CCDED] *** documenting the volume and/or tonnage of municipal waste and the volume and/or tonnage of recyclables collected" from residential and nonresidential properties within the County's boundaries.

¶ 6    Division 3 applies to solid waste facilities. It provides that each facility must comply with operational requirements including specific measures for equipment availability and maintenance; utility capacity; facility cleaning; mud, litter, dust, rodent, noise, and odor control; safety and security measures; waste screening; driveway and parking grading; and recordkeeping. It requires facility operators to: (1) submit to the County any Illinois Environmental Protection Agency (IEPA), U.S. Environmental Protection Agency or Army Corps Engineers correspondence pertaining to violations; (2) notify the County of cessation of waste acceptance; (3) remove or containerize waste within certain time limits; (4) maintain waste volume not to exceed the operator's IEPA permit; (5) cover outside storage containers to prevent

blowing debris; and (6) remove leaking containers. Additionally, the division requires both sanitary landfill and municipal waste transfer station operators to file quarterly reports to the County "specifying the quantities of waste and/or recyclable materials accepted" and pay an operating fee to the County. The fees collected from the facilities are assessed on a per ton basis, and are to be paid at the time each quarterly report is submitted. Division 3 also requires clean construction or demolition debris operators to submit reports to the County "indicating the weight or volume of all materials collected"; these operators must also acquire a County permit, in which case, the County is authorized to assess a permit application fee. Finally, Division 3 creates the Solid Waste Management Fund which authorizes the County to use the operating fees collected from sanitary landfills and municipal solid waste transfer stations "only for the purposes stipulated in 5/22.15 of the [Environmental Protection Act 415 ILCS 5/22.15 (West 2012))]."[3]

¶ 7    Division 4 applies to recycling facilities. The division imposes operational requirements similar to those in division 3, including mud, litter, dust, rodent, noise, and odor control as well as requirements for storage, signage, refrigerant recovery, waste and used liquid transfer and storage, runoff prevention, and tire storage. Division 4 requires that recycling facilities submit reports to the County summarizing recycling activities, including, "(1) the weight of all materials collected in total by the permittee; and (2) the weight of all materials recycled." It also mandates all recycling facilities to operate under a County recycling permit, and authorizes the County to assess and collect a permit application fee based on the type of recycling facility (*e.g.* class I,

---

[3] Section 22.15(j) of the Environmental Protection Act reads, in relevant part, "[a] unit of local government, *** in which a solid waste disposal facility is located may establish a fee, tax, or surcharge with regard to the permanent disposal of solid waste. All fees, taxes, and surcharges collected under this subsection shall be utilized for solid waste management purposes, including long-term monitoring and maintenance of landfills, planning, implementation, inspection, enforcement and other activities consistent with the Solid Waste Management Act and the Local Solid Waste Disposal Act, or for any other environment-related purpose, including but not limited to an environment-related public works project." 415 ILCS 5/22.15(j) (West 2012).

class II, etc). Additionally, division 4 imposes a duty on facilities to limit the percentage of incoming nonrecyclable debris to 25%, provides recordkeeping requirements, and establishes penalties for violations of its provisions.

¶ 8    On April 9, 2014, plaintiff filed a complaint for declaratory and injunctive relief. In its complaint, plaintiff alleged that defendant lacked home rule authority to impose fees upon and regulate the operations of solid waste transfer stations and recycling centers, because these facilities "are integral to a regional, comprehensive approach to waste collection, transport, management and disposal." Plaintiff further alleged that the SWRO exceeded the County's home rule authority because it specifically purports to regulate: "(1) regional institutions, (2) issues involving the other counties participating in [a] regional solid waste management system, and (3) issues currently and traditionally regulated on a regional and statewide basis by the State of Illinois."

¶ 9    On April 10, 2014, plaintiff filed an "Emergency Motion for Temporary Restraining Order and Preliminary Injunction," pursuant to sections 11-101 and 11-102 of the Code of Civil Procedure (Code) (735 ILCS 5/11-101, 11-102) (West 2012)). In its motion, plaintiff argued that the SWRO "purports to impose comprehensive operational, recordkeeping, permitting and fee payment obligations on solid waste transfer stations and recycling centers that, though located within Cook County, operate on a regional basis as part of the region's integrated system of solid waste collection, consolidation, transport and disposal." The trial court denied the motion, finding that the plaintiff failed to demonstrate that it was likely to succeed on the merits of its claim.

¶ 10    On May 1, 2014, plaintiff filed a motion seeking interlocutory appeal of the trial court's denial of its motion for a temporary restraining order under Illinois Supreme Court Rule

307(a)(1) (eff. Feb. 26, 2010), which this court unanimously denied. On May 21, 2014, defendant filed a motion to dismiss pursuant to section 2-615 (735 ILCS 5/2-615 (West 2012)) of the Code, which the trial court subsequently denied.

¶ 11    On August 8, 2014, the parties filed cross motions for summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2012)). The parties attached various affidavits in support of their motions. The County included an affidavit from CCDEC's solid waste coordinator, Christopher Lipman.[4] Lipman averred that:

> "9. transfer stations are utilized within Cook County to aggregate waste collected from various locations by garbage trucks. These trucks often travel from locations outside the local municipality where the transfer station is located and at times transport waste from locations outside suburban Cook County to transfer stations located within the county.
>
> 10. According to the 2009 IEPA landfill capacity report, the last known years of such data, approximately 2.9 million tons of waste were processed in Cook County transfer stations. This figure did not include amounts processed from several transfer stations that did not report any data. The West Central Municipal Conference reported approximately 3.5 million tons of waste was [*sic*] processed in Cook County transfer stations in 2009."

¶ 12    Lipman further noted that "many of the transfer stations and recycling facilities operating in Cook County are located adjacent to or in close proximity to residential and commercial locations," and pointed out that "[a]mong issues impacting local residents and businesses from the operation of transfer stations and recycling facilities are increased traffic, odors, debris, dust, and vermin."

---

[4] The trial court struck a portion of Lipman's affidavit from the record; we have not quoted from those sections.

¶ 13    On October 31, 2014, the trial court granted defendant's motion for summary judgment and denied plaintiff's motion. In doing so, the court considered the test set forth in *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483 (1984), and concluded that "I think that the County can legislate concurrently with the State on environmental matters. *** I think that the County has expressed vital interests that need to be protected that is, the health and safety and welfare of the citizens of Cook County, and I think the ordinance was designed to do that." The court rejected plaintiff's argument that the movement and storage of waste is a regional issue and that the SWRO "affects some regional plan" of waste management. Plaintiff appealed.

¶ 14                                          ANALYSIS

¶ 15    Plaintiff contends that because solid waste management system operates on a "regional basis," the County had neither home rule nor statutory authority to enact the challenged provisions of the SWRO. Contrarily, the County contends that the SWRO is legally valid because it had both statutory and home rule authority to enact the ordinance.

¶ 16    Our review of the trial court's order granting summary judgment is *de novo*. *Sears Roebuck & Co. v. Acceptance Insurance Co.*, 342 Ill. App. 3d 167, 171 (2003). Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012); *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 50 (1999). As in this case, where the parties file cross-motions for summary judgment, they invite the court to decide the issues presented as a matter of law. *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill. App. 3d 128, 134 (2001).

¶ 17    In the instant case, plaintiff essentially argues that the County's ordinance is invalid because the problems presented by solid waste management issues are "regional and state-wide in nature," and thus, have been traditionally regulated at the state level. In support of its contention, plaintiff focuses its analysis on the State's "existing regulatory program," namely, the Illinois Environmental Protection Act, which provides that "because environmental damage does not respect political boundaries, it is necessary to establish a *unified* state-wide program for environmental protection." (Emphasis added.) 415 ILCS 5/2(a)(ii) (West 2012). Plaintiff's analysis fails, however, because it disregards the General Assembly's passage of the Solid Waste Act in its evaluation of the State's regulatory scheme. 415 ILCS 15/1 (West 2012). Particularly, although the Illinois Environmental Protection Act provides a framework for establishing a unified program for environmental protection in the state of Illinois, the General Assembly enacted the Solid Waste Act to confer upon each county the responsibility to develop and implement a plan for the management of waste within its respective boundaries. For this reason, we begin our analysis with a review of the Solid Waste Act and determine whether it authorizes the County to enact the challenged provisions of the SWRO.

¶ 18    A reviewing court's primary objective in performing statutory construction is to give effect to the legislature's intent. *In re Application of the County Treasurer & ex officio County Collector*, 2013 IL App (1st) 130103, ¶ 9. The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Id.* Reviewing courts should consider a statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it, and avoiding constructions that would render any term meaningless or superfluous. *Fisher v. Waldrop*, 221 Ill. 2d 102, 112 (2006).

¶ 19     Here, the County established the SWRO pursuant to the mandates of the State's Solid Waste Act. The General Assembly enacted the Solid Waste Act in response to its finding that parts of the State have inadequate and rapidly diminishing disposal capacity for municipal waste. 415 ILCS 15/2(a)(1) (West 2012). The purpose of the Solid Waste Act is "to provide incentives for decreased generation of municipal waste, to require certain counties to develop comprehensive waste management plans that place substantial emphasis on recycling and other alternatives to landfills, to encourage municipal recycling and source reduction, and to promote composting of yard waste." 415 ILCS 15/2(b) (West 2012). The Solid Waste Act expressly provides that "counties should have the *primary responsibility* to plan for the management of municipal waste within their boundaries to insure the timely development of needed waste management facilities and programs." (Emphasis added.) 415 ILCS 15/2(a)(2) (West 2012). In accordance with this grant of authority, the Solid Waste Act expressly requires all counties to adopt a plan "for the management of municipal waste generated within its boundaries." 415 ILCS 15/4(a) (West 2012).   The Solid Waste Act requires, *inter alia*, that each waste management plan include, *at a minimum*:

¶ 20         "(1) A description of the origin, content and weight or volume of municipal waste currently generated within the county's boundaries, and the origin, content, and weight or volume of municipal waste that will be generated within the county's boundaries during the next 20 years, including an assessment of the primary variables affecting this estimate and the extent to which they can reasonably be expected to occur.

¶ 21         (2) A description of the facilities where municipal waste is currently being processed or disposed of and the remaining available permitted capacity of such facilities.

¶ 22    (3) A description of the facilities and programs that are proposed for the management

of municipal waste generated within the county's boundaries during the next 20 years,

including, but not limited to their size, expected cost and financing method." 415 ILCS

15/4(c)(1) – (c)(3) (West 2012).

¶ 23    The Solid Waste Act also contains requirements for the implementation of a recycling program, which requires, *inter alia*, that the program: (1) be implemented throughout the county and include a time schedule for implementation of the program; (2) be designed to recycle, by the end of the third and fifth years of the program, respectively 15% and 25% of the municipal waste generated in the county based on measurements of recycling and waste generated in terms of weight; and (3) include provisions for compliance, including incentives and penalties. 415 ILCS 15/6 (1), (3), (9) (West 2012). The Solid Waste Act further provides that "[e]ach county waste management plan *** shall be updated and reviewed every 5 years, and any necessary or appropriate revisions shall be submitted to the [IEPA] for review and comment."

¶ 24    A review of the plain language of Solid Waste Act reveals that the General Assembly intended for each county to have the primary responsibility to implement policies and procedures that adequately address waste management concerns within their respective boundaries. Thus, we reject plaintiff's contention that the Solid Waste Act neither expressly nor impliedly grants regulatory authority to the County in the area of waste management. The fact that the Solid Waste Act provides counties with only minimal directions in developing its comprehensive waste management plan supports a finding that the legislature surmised that counties, who are in a better place than the State in evaluating its own needs, are more effective at developing a plan to solve the pressing issues regarding both inadequate and rapidly diminishing waste disposal capacity across the State. Our review also reveals that the SWRO's extensive reporting

provisions, with which plaintiff takes issue, demonstrate the County's efforts to comply with the Solid Waste Act's requirement that the County, in developing its plan, "provide descriptions of the origin, content, and weight of municipal waste generated within its boundaries" as well as its mandate that a specific percentage of the County's waste be recycled based on measurements of recycling and waste generated in the County. Clearly, the only way for the County to satisfy these requirements is to require facilities operators to document and report the specific amounts of waste and recycled materials in its facilities.

¶ 25    Accordingly, because the Solid Waste Act explicitly grants each county the authority to craft waste management plans according to its respective needs, we find that the challenged provisions of the SWRO, in which the County imposes regulations, operational requirements and fees on operators of Cook County-based solid waste and recycling facilities, is well within the County's grant of authority by the legislature.

¶ 26                          Home Rule Authority

¶ 27    Blended within plaintiff's contention that the County lacked statutory authority to enact the challenged ordinance provisions is its additional contention that the City also lacked home rule authority. Further, plaintiff contends, even if enactment of the challenged provisions was pursuant to home rule authority, the County exceeded that authority.

¶ 28    Our finding that the County's enactment of the subject provisions within the SWRO was within its statutory authority sufficiently disposes of plaintiff's challenges. Nevertheless, as plaintiff's argument is largely grounded in what is, at best, a flawed analysis of home rule authority, we choose to address it, as well as its additional arguments, which happen also to have been blended within its challenge to the County's statutory authority.

11

¶ 29    "Home rule is based on the assumption that municipalities should be allowed to address problems with solutions tailored to their local needs." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 29. As such, article VII, section 6(a) of the Illinois Constitution provides that:

> "[e]xcept as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 30    "Section 6(a) was written with the intention to give home rule units the broadest powers possible." *Palm*, 2013 IL 110505, ¶ 30 (citing *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992)), and the constitution expressly provides that the ' "[p]owers and functions of home rule units shall be construed liberally." ' Ill. Const. 1970, art. VII, § 6(m). Our constitution, however, limits a home rule unit to legislation " 'pertaining to its government and affairs.' " *City of Chicago v. Village of Elk Grove Village*, 354 Ill. App. 3d 423, 426 (2004) (quoting Ill. Const. 1970, art. VII, § 6(a)). Furthermore, under article VII, section 6(h), the General Assembly "may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit" (Ill. Const. 1970, art. VII, § 6(h)), but if the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect. *Palm*, 2013 IL 110505, ¶ 31. Accordingly, "[i]f a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power." *Id.* ¶ 36 (quoting *City of Chicago v. StubHub, In*c., 2011 IL 111127, ¶ 22 n.2).

¶ 31    In the instant case, plaintiff fails to cite any legislative act which expressly preempts the County from legislating in the area of waste management. Therefore, the relevant inquiry here is

whether the subject of waste management pertains to the County's local government and affairs for purposes of section 6(a) of the constitution.

¶ 32    In determining whether a subject pertains to local government and affairs, we have traditionally looked to our supreme court's holding in *Kalodimos*, 103 Ill. 2d 483. In that case, the court upheld a comprehensive operable handgun ordinance in Morton Grove, Illinois because the legislation addressed a local problem and did not regulate conduct outside of its boundaries. In doing so, the court recognized that:

¶ 33         "Whether a particular problem is of statewide rather than local dimension must be decided not on the basis of a specific formula or listing set forth in the Constitution but with regard for (1) the nature and extent of the problem, (2) the units of government which have the most vital interest in its solution, (3) and the role traditionally played by local and statewide authorities in dealing with it." *Id.* at 501.

¶ 34    Applying the tri-part test in *Kalodimos*, we agree with defendant that the regulation of waste material within the County's boundaries is a subject that pertains to its local government and affairs.

¶ 35                          Nature and Extent of the Problem

¶ 36    Here, the nature of the problem is the management of waste within the County. In regard to the extent, our review of the Lipman affidavit reveals that millions of tons of waste, both from within the County and surrounding municipalities, are processed in the County's transfer stations. According to Lipman, "many of the transfer stations and recycling facilities operating in Cook County are located adjacent to or in close proximity to residential and commercial locations." With such a large amount of waste being processed in the County, "material being transported and transferred within the county ha[s] the potential to cause harm to the individuals residing

13

within [the County]." Lipman specifically states that local residents and businesses experience "increased traffic, odors, debris, dust, and vermin." He also noted the negative environmental and economic effects when the facilities leave the County. Clearly, the problem that the SWRO seeks to address is the significant public health risks that the operations of solid waste and recycling facilities pose to County residents. Because both the nature and extent of the environmental problems associated with waste management are local in nature, the first *Kalodimos* factor favors the County.

¶ 37                                        Vital Interest

¶ 38    Regarding the second *Kalodimos* factor, the County, and not the State, has the most vital interest in determining a solution to the problems arising from waste management within its boundaries. As our supreme court noted in *Kalodimos,*

> "[h]ome rule, *** is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem." *Kalodimos*, 103 Ill. 2d at 502.

¶ 39    Here, as discussed above, the General Assembly, through the Solid Waste Act, has determined that issues of local waste management are more effectively addressed at the county level. This is a sound approach as it allows each county to develop tailored plans which address its specific waste management issues and the problems that the issues create for the residents of its communities. Thus, the second *Kalodimos* factor favors the County.

¶ 40              The Role Traditionally Played by Local and Statewide Authorities

¶ 41    In regard to the third and final *Kalodimos* factor, with the passage of the Solid Waste Act in 1988, the General Assembly delegated waste management responsibilities to the County and expressly required it to develop and implement an on-going comprehensive waste management plan. Thus, for at least the past 28 years the County has been primarily responsible for addressing local waste management concerns, and therefore, has had a more traditional role in dealing with the problem than the State. See *County of Cook v. Village of Bridgeview*, 2014 IL App (1st) 122164 (finding that the County had a more traditional role in dealing with the stray animal population and the spread of rabies where the General Assembly had explicitly conferred authority upon the County with the passage of the 1973 Animal Control Act). Accordingly, the final *Kalodimos* factor favors the County.

¶ 42    Based on our above analysis, we find that the SWRO pertains to the County's local government and affairs; namely, its power to regulate for the health, safety, and welfare of County residents who are undoubtedly impacted by the presence of solid waste and recycling facilities within their community.

¶ 43    Moreover, we note that in *County of Cook v. John Sexton Contractors Co.*, 75 Ill. 2d 494, 514-15 (1979) (superseded by statute on other grounds as recognized in *Village of Carpentersville v. Pollution Control Board*, 135 Ill. 2d 463 (1990)) our supreme court recognized the County's ability to legislate concurrently with the State on environmental control issues pursuant to its home rule powers.

¶ 44    In *John Sexton*, the court considered whether the plaintiff was required to conform to the County's zoning ordinance after the State had issued the plaintiff a final developmental permit for the operation of a landfill. Similar to plaintiff in the instant case, the plaintiff argued that the Illinois Environmental Protection Act established a "state-wide program of environmental

15

regulation" which precluded the County from regulating sanitary landfills under its home rule power. *John Sexton Contractors Co.*, 75 Ill. 2d at 510. The *John Sexton* court found that although a home rule unit must conform with the minimum standards established by the legislature, unless the legislature limits the exercise of home rule units, " 'home rule units are supposed to be free to carry on activities that relate to their communities even if the state also is interested and is active in the area.' " *Id.* at 510-11 (quoting David Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 155). The court ultimately held that, even though the plaintiff had been issued a permit by the IEPA, it also had to conform to the zoning ordinance of the home rule county in which it was located.

¶ 45 Additionally, the court in *John Sexton* declined to extend the holding in *Metropolitan Sanitary District v. City of Des Plaines*, 63 Ill. 2d 256 (1976), in which the supreme court prohibited the application of a local ordinance to the sanitary district, a regional entity serving numerous municipalities. *John Sexton Contractors Co.*, 75 Ill. 2d at 510. In doing so, the court noted that although the landfill that the plaintiff desired to operate would be used by surrounding communities, the County was not attempting to legislate outside of its boundaries because the zoning ordinance simply regulated the location of sanitary landfills within the County's boundaries and did not attempt to regulate a regional entity. *Id.* at 510.

¶ 46 The facts in the instant case demand a similar result. Although the Illinois Environmental Protection Act provides a unified framework of environmental regulation, it does not preclude the County from exercising its home rule authority in the field. Accordingly, it is clear that the legislature envisioned that the County would have the authority to adopt regulations that require owners of solid waste and recycling facilities operating within its boundaries to adhere to certain requirements such as those contained in the SWRO. Furthermore, because the County seeks to

regulate and impose fees on facilities located within its boundaries, and does not seek to regulate a regional entity as in *Metropolitan Sanitary District*, we adopt the reasoning in *John Sexton* and reject plaintiff's contention that the SWRO attempts to address regional or statewide environmental problems.

¶ 47    Accordingly, we hold that the trial court did not err when it found that the County was within its home rule authority when it enacted the SWRO.

¶ 48                          Plaintiff's Remaining Contentions

¶ 49    Plaintiff argues that even if we find that the County was within its home rule authority to enact the challenged provisions of the SWRO, the SWRO exceeds the County's home rule authority because: (1) the County cannot tax with extraterritorial effect; (2) Illinois law prohibits home rule units from burdening access to unified, statewide systems; and (3) the SWRO's "operational regulations have extraterritorial effects." However, plaintiff's claims lack merit.

¶ 50    First, plaintiff cites *Seigles, Inc. v. City of St. Charles*, 365 Ill. App. 3d 431, 435 (2006), for the contention that the SWRO is void because a home rule unit cannot tax in a manner having "extraterritorial effects." Here, although plaintiff argues that the County imposes an impermissible tax on waste and recycling facilities with its adoption of the SWRO, the County merely assesses a fee on such facilities that operate within its boundaries. Thus, *Seigles*, *Inc.* is inapposite. Moreover, we note that the fees assessed by the County are permissible. In *A&H Vending Service, Inc. v. Village of Schaumburg*, 168 Ill. App. 3d 61, 62 (1988), this court upheld a home rule municipality's vending machine licensing ordinance, which assessed annual licensing fees on operators of vending machines within the village. The court explained that a license fee for regulatory purposes "can be sustained as long as the license fee bears some reasonable relation to the cost of regulation." *Id.* at 64. The court further noted that "[u]nless that

17

fee is arbitrary or in great excess of the cost of enforcement and as long as the ordinances contain genuine regulatory provisions, the courts have been generous in sustaining a licensing fee for regulatory purposes." *Id.* Here, the fees collected from sanitary landfill operators and municipal solid waste transfer stations are used to support the County's Solid Waste Management Fund and are "used only for the purposes stipulated in 5/22.15 of the [Illinois Environmental Protection Act]." Additionally, other fees assessed under divisions 3 or 4 are permit fees, which facilitate the processing of applications for clean construction and demolition debris fill operations as well as recycling facilities. The fees established under the ordinance merely reflect the County's reasonable costs of regulating in this area, and are thus permissible. See *id.*

¶ 51 Next, plaintiff argues that the SWRO is invalid because Illinois law prohibits home rule units from burdening access to unified, statewide systems, and cites *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537 (1975), for this contention. In *Ampersand*, a Cook County ordinance directed the circuit court to collect a $2 filing fee, which purported to supersede a similar state statute which imposed a $1 filing fee. *Id.* at 538. Our supreme court invalidated the County's statute, finding that the constitution established a single unified court system, and thus, the "administration of justice *** is a matter of statewide concern and does not pertain to local government or affairs." *Id.* at 542. The court also considered the charge of the fee to be a "condition to the right to litigate in the courts *** which cannot be imposed by a home rule unit." *Id.* at 543. Here, although the Environmental Protection Act seeks to create a unified system of environmental regulation, unlike in *Ampersand*, the State does not preclude a home rule unit from legislating in this field. Thus, *Ampersand* is inapposite.

¶ 52 Plaintiff also contends that the SWRO's operational regulations will have impermissible "extraterritorial effects," that is, the regulations will push the negative impacts associated with

waste consolidation out of Cook County and into the surrounding counties. In support of its contention, it cites *Village of Bridgeview*, 2014 IL App (1st) 122164, *City of Des Plaines v. Chicago & North Western Ry. Co.*, 65 Ill. 2d 1, 2 (1976), and *People ex rel. Bernardi v. City of Highland Park*, 121 Ill. 2d 1 (1988). However, these cases are easily distinguishable.

¶ 53    In *Village of Bridgeview*, this court found that the village exceeded its home rule authority by enacting an ordinance that prohibited residents from operating feral cat colonies, in conflict with a Cook County ordinance which permitted such colonies. *Village of Bridgeview*, 2014 IL App (1st) 122164, ¶ 4. The court ultimately held that the county had a greater interest in controlling the feral cat population than did the Village "given the fact that feral cats freely roam across neighboring municipalities and that home rule municipalities cannot legislate outside their geographical borders." *Id.* at ¶ 17. *City of Des Plaines* is equally unavailing. There, our supreme court found that the city's attempt to regulate noise pollution, caused by trains in transit, was not within the home rule power granted by the Illinois Constitution because noise pollution "extends beyond its source." *Chicago & North Western Ry. Co.*, 65 Ill. 2d at 5. In the instant case, the SWRO seeks to regulate solid waste and recycling facilities located within the County and, unlike the ordinances in both *Village of Bridgeview* and *City of Des Plaines*, does not impermissibly regulate activities that extend beyond its geographical boundaries.

¶ 54    We also find plaintiff's reliance on *City of Highland Park* misplaced. There, our supreme court rejected the city's attempt to opt out of the Illinois Prevailing Wage Act, which regulated the wages of workers employed on public works projects. *City of Highland Park*, 121 Ill. 2d at 16. Our supreme court found that the Prevailing Wage Act addresses an issue of statewide concern and home rule authority could not abrogate the State's "comprehensive scheme of governmental intervention in the workplace." *City of Highland Park*, 121 Ill. 2d at 14-16. In the

instant case, the challenged provisions of the SWRO do not purport to abrogate an existing regulatory scheme established by the State such as the home rule municipality's attempt in *City of Highland Park*.

¶ 55    Finding no merit to any of plaintiff's remaining contentions, we conclude that the County had both statutory and home rule authority to enact the challenged provisions of the SWRO.

¶ 56                                    CONCLUSION

¶ 57     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 58    Affirmed.